IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 23-cv-02288-CNS-JPO

J.J.H.,

      Plaintiff,

v.

UNUM LIFE INSURANCE COMPANY OF AMERICA,

      Defendant.

---

## ORDER

---

      Plaintiff J.J.H.[1] brought this suit against Defendant Unum Life Insurance, alleging that Defendant unlawfully denied her long-term disability benefits in violation of the Employment Retirement Security Act of 1974 (ERISA). The administrative record and merits briefing are complete, and the parties now ask the Court to decide whether Defendant's benefits decision was lawful. ECF No. 33 (Joint Motion for Determination on the Administrative Record). Having thoroughly analyzed the record, the parties' briefing, and the applicable authority, the Court finds that substantial evidence supports the Defendant's denial of Plaintiff's benefits and thus AFFIRMS Defendant's benefit determination.

---

[1] In Social Security Appeals, D.C.COLO.L.APR 5.2(b) requires the Court to identify the plaintiff by initials only. The Court will do the same here and refer to Plaintiff by her initials only.

## I.    BACKGROUND

### A.    Plaintiff's Occupation, Employer, and the Plan

Plaintiff is a transactional attorney employed by an international law firm and based in its Denver office. Administrative Record (A.R.) at 251. The parties agree that her role is sedentary but requires numerous cognitive demands. *Id.* at 645–55.

Plaintiff was, and apparently still is, a participant in the [Law Firm] and its Subsidiaries Plan, which provides short-term disability (STD) and long-term disability (LTD) benefits. ECF No. 29 at 3; ECF No. 23 (May 1, 2024 joint status report noting that Plaintiff has returned to work on a part-time basis). STD benefits are self-funded by Plaintiff's employer, and LTD benefits are funded through a group insurance policy from Defendant. ECF No. 29 at 3.

The LTD Plan and group policy defined "disability" and "regular occupation" as follows:

Classes 1, 2, 4, 5 and 6

- "Disability" and "disabled" mean that because of injury or sickness:

    1. you cannot perform each of the material duties of your regular occupation; or

    2. you, while unable to perform all of the material duties of your regular occupation on a full-time basis, are:

        a. performing at least one of the material duties of your regular occupation or another occupation on a part-time or full-time basis; and

        b. earning currently at least 20% less per month than your indexed pre-disability earnings due to that same sickness or injury.

    Note:  For attorneys, "regular occupation" means the specialty in the practice of law which you were practicing just prior to the date the disability started.

2

*Id.*; A.R. at 135. Plaintiff is a Class 2 employee under the Plan, eligible for a benefit of up
to 50% of her monthly earnings, not to exceed $10,000 per month. A.R. at 5.

### B.    Plaintiff's COVID-19 Illness

Plaintiff first reported COVID-19 symptoms beginning on January 13, 2022. A.R.
at 360. Sometime the following week she tested positive for COVID-19. *Id.* at 1353
(January 18, 2022); *id.* at 1673 (January 20, 2022). She complained of fatigue, brain fog,
confusion, forgetfulness, difficulty concentrating, difficulty planning/executing tasks,
increased or abnormal heart rate, heart palpitations, chest pain, headache,
lightheadedness, dizziness, dyspnea, blood pooling in her feet, abdominal pain, and
diarrhea. *Id.* at 92, 345–46, 357, 612.

After her positive COVID-19 test, Plaintiff continued to work from home on a
reduced basis. *Id.* at 1353–54. She did not take formal leave, and her pay was not
reduced during this period. *Id.* at 219–34, 276.

### C.    Plaintiff's Short-Term Disability Benefits

The Plan contained a 90-day elimination period of consecutive days of disability
for which no benefit is payable. *Id.* at 681. During the elimination period (April 20, 2022,
to July 21, 2022), the law firm offered STD, also administered by Defendant. ECF No. 26
at 5.

In April 2022, Plaintiff stopped worked and submitted a claim for STD benefits
based on "post-covid fatigue" and "cognitive attention deficit." *Id.* at 60–66. She reported
her last day of work was April 20, 2022. *Id.* at 60. Dr. Karen Burnett, Plaintiff's primary
care physician, reported Plaintiff's restrictions and limitations as the following: "unable

work a full day due to fatigue, difficulty concentrating, difficulty interacting with clients. Memory impairment. Standing for long periods of time." *Id.* at 66. Defendant approved Plaintiff's STD claim on April 29, 2022, effective April 22 through May 7, 2022. *Id.* at 877. Defendant later extended Plaintiff's STD benefits through June 25, 2022. *Id.* at 880 (letter dated June 9, 2022). In the end, Defendant approved all of the STD available. A.R. at 1678 ("We acknowledge that . . . [STD] was approved through the maximum period of payment.").

### D.    Plaintiff's Transition to Long-Term Disability

After Plaintiff reached the maximum benefit period for STD in June 2022, Defendant transitioned her claim to a long-term disability (LTD) claim. *Id.* at 1678. Also in late June 2022, Dr. Burnett provided updated restrictions and limitations permitting Plaintiff to return to work on a part-time basis beginning June 27. *Id.* at 185. Dr. Burnett advised that Plaintiff should work from home on a limited afternoon schedule. *Id.* (restricting Plaintiff to a "total of 5 hours a day starting at noon"). Dr. Burnett stated that Plaintiff's ability to return to full-time employment was "still to be determined, awaiting evaluation by the UChealth post covid clinic" at her upcoming June 29, 2022 appointment. *Id.*

### E.    Defendant's Long-Term Disability Claim Investigation, Medical Records Review, and Initial Determination

As Defendant began its LTD claim investigation, it learned that Plaintiff was working a reduced schedule but did not have a reduction in earnings. ECF No. 29 at 5. The law firm was continuing to pay "100% of her salary until her LTD claim was approved." A.R. at 391 (email from law firm's HR specialist). Defendant explained that, because

Plaintiff had been paid in full and was not experiencing an earnings loss, she was not

eligible for LTD benefits under the policy. *Id.* at 424. Defendant further explained that, if

Plaintiff would like Defendant to consider her LTD claim, she would need to repay the law

firm the money she was paid since she went out of work. *Id.* On August 15, 2022, the law

firm confirmed it would withhold pay from her future checks to recoup the overpayment.

*Id.* at 428. Defendant then proceeded with its LTD claim investigation.

As part of this process, Defendant acquired information from the law firm about

Plaintiff's job duties. Deborah Nix, a Vocational Consultant, then analyzed the material

physical and cognitive requirements of Plaintiff's occupation. *Id.* at 645–47. Ms. Nix

determined that Plaintiff's occupation was sedentary work with limited physical demand.

*Id.* Concerning the "Mental/Cognitive Demands," she determined the following:

> Dealing with People: Involves interpersonal relationships in job situations beyond receiving work instructions.
>
> Performing a Variety of Duties: Involves frequent changes of tasks involving different aptitudes, technologies, techniques, procedures, working conditions, physical demands, or degrees of attentiveness without loss of efficiency or composure. The involvement of the worker in two or more fields may be a clue that this temperament is required.
>
> Influencing People in their Opinions, Attitudes, & Judgments: Involves writing, demonstrating, or speaking to persuade and motivate people to change their attitudes or opinions, participate in a particular activity, or purchase a specific commodity or service.
>
> Directing, Controlling, or Planning Activities for Others: Involves accepting responsibility for formulating plans, designs, practices, policies, methods, regulations, and procedures for operations or projects; negotiating with individuals or groups for agreements or contracts; and supervising subordinate workers to implement plans and control activities.
>
> Making Judgments and Decisions: Involves solving problems, making evaluations, or reaching conclusions based on subjective or objective criteria, such as the five senses, knowledge, past experiences, or quantifiable or factual data.

*Id.* at 646.

Defendant then acquired Plaintiff's medical records and asked April K. Vansandt,

a clinical consultant and registered nurse with a Master of Science in nursing, to review

the records. ECF No. 29 at 6. In her clinical analysis dated September 22, 2022, Ms.

Vansandt was "[u]nable to identify a change" in Plaintiff's "prior level of function from when

she was working [full time]." *Id.* at 656. She thus concluded that Plaintiff would not be

precluded from performing the full time functional demands. *Id.* In summarizing her

findings, she explained that

- The file did not provide "assessments or clinical findings" reflecting "any cognitive limitations or impairment." Plaintiff had "not been referred for any cognitive testing." She "present[ed] to her appointments, [was] able to recall information, [the] assessments document[ed] [that she was] alert and oriented, and [she] demonstrated [an] ability to [return to work] on a part time basis."

- Plaintiff "ha[d] undergone extensive evaluation without findings to correlate her reported fatigue." Although she "ha[d] episodic tachycardia, her activities [were] inconsistent with being precluded from her [occupational] demands" because she reported weightlifting as part of her participation in medically recommended physical therapy.

- Her headaches "are reported but do not appear to rise to a level consistent with impairment. [Plaintiff was] working part time, attending appointments, and participating in [physical therapy] on a regular basis as scheduled."

- Plaintiff reported gastrointestinal issues but "has not undergone any additional workup or GI consultation. Based on available information on file, this does not appear to be impairing or limiting."

*Id.*

Because Ms. Vansandt did not find support for Plaintiff's claim, she requested a

"forum" meeting with an on-site physician. *Id.* at 656, 658–60. Defendant held a forum

meeting on September 27, 2022, which included Dr. Elizabeth Belanger, who is board-

certified in internal medicine and infectious diseases. *Id.* at 660. After discussion, the group decided that Dr. Belanger should speak with Dr. Burnett, Plaintiff's primary care physician. *Id.*

Dr. Belanger spoke with Dr. Burnett on the evening of September 27, 2022. *Id.* at 661–62. Dr. Burnett confirmed neurology had diagnosed Plaintiff with postural orthostatic tachycardia syndrome (POTS) and cardiology was considering an ablation for supraventricular tachycardia. *Id.* at 662. As to any restrictions and limitations, Dr. Burnett wished to defer these to Plaintiff's neurologist, Dr. Katalin Pocsine. *Id.* Dr. Belanger confirmed this in a letter to Dr. Burnett. *Id.* at 676–77 ("You indicated [during our September 27, 2022 phone call] that you wish to defer restrictions and limitations for Ms. [J.J.H.] to her treading neurologist Dr. Katalin Pocsine, MD as of their initial visit on 6/28/22."). However, Dr. Pocsine had earlier declined to provide restrictions and limitations and informed Defendant that Plaintiff's primary care provider should provide restrictions and limitations. *Id.* at 485 (in a medical records request from Defendant, Defendant asked for Plaintiff's neurologist to "provide current restrictions and limitations with focus on your patient's function"; neurologist responded "Primary Care Provider to Complete").

Dr. Belanger then wrote a doctoral review. *Id.* at 663–66. She advised the claims staff that Dr. Burnett had revised her opinion and documented in her report that "no medical disagreement currently exists" as to Plaintiff's restrictions and limitations. *Id.* at 666. The matter then returned to Stacey Todd, Defendant's lead benefit specialist, handling the claim. She recommended that the claim be terminated as Plaintiff was no

longer residually disabled because no medical provider was asserting restrictions and limitations. *Id.* at 669–74. Her recommendation was reviewed by Stephanie Mantooth, a Quality Compliance Consultant (QCC). Ms. Mantooth agreed with Ms. Todd's recommendation. *Id.* at 673–74.

Ms. Todd then sent a seven-page letter to Plaintiff on September 30, 2022, advising her that Defendant had determined that she was not disabled and that benefits are not payable because she was not precluded from performing the material and substantial duties of her regular occupation on a full-time basis beyond the 90-day elimination period. *Id.* at 681–87. The letter advised Plaintiff that neither of her physicians had provided supporting restrictions and limitations. *Id.* at 683.

### F.    Plaintiff's Response and Defendant's Second Denial

After Defendant sent its denial letter, Plaintiff returned to her neurologist, Dr. Pocsine, on October 10, 2022. Defendant states that Dr. Pocsine sent Plaintiff's records from office visits on September 22, 2022, and October 10, 2022, along with a letter. ECF No. 29 at 9; A.R. at 712 (letter from Dr. Pocsine). In her brief October 10, 2022 letter, Dr. Pocsine explained that she was treating Plaintiff for "pandysautonomia caused by probable COVID 19 infection," that Plaintiff had "new onset headaches," and that her "symptoms include fatigue, cognitive slowing, intolerance to sit and stand with palpitations and near syncope, and exercise intolerance." A.R. at 712. She went on to explain that Plaintiff returned to work from home on June 27, 2022. A.R. at 712. She also included restrictions and limitations not previously identified, including that she advised Plaintiff to increase her part-time workload to 30 hours a week, divided into small segments

throughout the five-day work week, but to continue working from home. *Id.* at 712, 718.

Defendant had Ms. Vansandt, its clinical consultant and registered nurse, review the letter and records from Dr. Pocsine and write another clinical analysis. *Id.* at 748–55. She concluded that the "[a]dditional records from neurology do not reflect clinical findings consistent with [Plaintiff] lacking functional capacity to sustain working sedentary level occ[upation]." *Id.* at 754. She referred the claim for another forum meeting with Dr. Belanger. *Id.*

At the forum meeting, Dr. Belanger determined that support for the restrictions and limitations beyond July 5, 2022, was not clear. *Id.* at 756–60. The group agreed that Dr. Belanger should contact Dr. Pocsine for further clarification. *Id.* at 759. Dr. Belanger spoke with Dr. Pocsine on October 27, 2022. *Id.* at 764. Dr. Pocsine still believed that Plaintiff was "precluded from performing the full time occupational demands due to fatigue and cognitive difficulties after 2 hours of work" and recommended that Plaintiff limit her work to 30 hours per week. *Id.*

Dr. Belanger felt "[u]ncertainty still exists" and wrote a lengthy doctoral review concluding that "the evidence does not support restrictions and limitations precluding the insured from full time participation in the occupational demands," followed by a three-page rationale for that determination. *Id.* at 768–71. Dr. Belanger noted that Plaintiff "was able to continue working for 3 months from the time of the January 2022 Covid-19 infection until the 4/22/22 date of disability" and had "confirmed the absence of work accommodations prior to 4/22/22 during a 7/11/22 telephone call with the benefits specialist." *Id.* at 768.

9

Considering Plaintiff's physical state, Dr. Belanger found that Plaintiff's "reported activities d[id] not support that [she] [wa]s precluded from performing [her] occupational demands," explaining that Plaintiff had continued weightlifting, had started physical therapy, and was able to walk up to half a mile. *Id.* Dr. Belanger noted that, in a call with the benefit specialist, Plaintiff reported improvement in brain fog, fatigue, and palpitations, and she was doing more each week at the gym. *Id.* Dr. Belanger explained that Plaintiff's activities "exceed[ed] the defined sedentary occupational demands and appear[ed] inconsistent with the level of fatigue described as impairing by AP Dr. Pocsine . . . ." *Id.*

Turning to Plaintiff's cognitive state, Dr. Belanger noted that there was no cognitive impairment documented, and that the records indicated that Plaintiff had improved since the initial date of disability. *Id.* She explained that Plaintiff's neurological examination found that Plaintiff had one out of 10 for headache pain. *Id.* Dr. Belanger acknowledged that Plaintiff had decreased systolic blood pressure and tachycardia after standing for three minutes, but she explained that Plaintiff appeared in no distress with normal alertness, attention span, language comprehension, and language expression. *Id.*

Dr. Belanger then reviewed Dr. Burnett's examination notes and explained that the medical records "document[ed] [Plaintiff] as demonstrating normal memory and orientation," "appearing in no acute distress, speaking in full sentences," having "[n]ormal ability to communicate, appropriate mood," and experiencing "[n]o fatigue or difficulty participating in visits due to cognitive difficulties." *Id.* at 769. She went on to find that the records further indicated that Plaintiff had "a normal level of consciousness" and demonstrated "normal insight, judgment, attention span, and concentration." *Id.* Dr.

Belanger observed that the "[i]ntensity of management" of Plaintiff's symptoms was "inconsistent with the nature, severity, persistence, and impact of reported symptoms." *Id.* Dr. Belanger concluded that Plaintiff's "demonstrated capacity, reported improvement in symptoms, reported activities, and low intensity of management reflected in the file did not support that [she] would be precluded from performing the outlined occupational demands on a full-time basis[.]" *Id.* She further explained that there is "adequate medical information included in the file upon which to formulate an opinion regarding the functional implications of the available data; therefore, a hands-on exam by an IME is not needed." *Id.* at 770. Dr. Belanger then referred the claim for a second level review with a Designated Medical Officer (DMO). *Id.*

Defendant states that it referred the DMO review to an outside vendor, Dane Street, to retain an appropriate physician. ECF No. 29 at 11; A.R. at 778–79. Dane Street asked neurologist Michael Chilungu, M.D., to perform the review and write a report. *Id.* at 774–77.

Dr. Chilungu determined that "physical examinations of the claimant inevitably reveal an individual who exhibits normal cognitive capabilities, normal speech, full strength, and well-preserved gait and balance capabilities, in spite of the fact that the claimant reports symptoms of persistent lightheadedness, and orthostatic intolerance." *Id.* at 776. He concluded that Plaintiff's medical records did not support "physical and/or cognitive impairment of such severity as to preclude [her] from functioning in accordance with [her] occupational requirements on a full-time basis." *Id.* He also noted that Plaintiff had been working five hours per day, five days a week since June 2022, "suggesting

11

retained occupational capabilities." *Id.* Considering the above, Dr. Chilungu agreed with Dr. Belanger that the medical evidence did not demonstrate that Plaintiff was unable to perform her occupational demands full time. *Id.*

The file went back to Ms. Todd, Defendant's benefit specialist, who reviewed the medical records and DMO review. Ms. Todd recommended terminating Plaintiff's LTD claim. *Id.* at 780–85. Her recommendation was reviewed by QCC Mantooth, who agreed with Ms. Todd's decision. *Id.* at 785–87. Ms. Todd called Plaintiff on November 2, 2022, to advise her of the decision and left her a voicemail. *Id.* at 788. That same day, Ms. Todd sent an eight-page letter to Plaintiff explaining the decision. *Id.* at 790–97.

### G.    Plaintiff's Appeal and Defendant's Third Denial

After receiving Defendant's November 2, 2022 denial letter, Plaintiff, through counsel, appealed the denial. *Id.* at 826–32. In support of the appeal, counsel provided a January 30, 2023 letter from Dr. Pocsine concluding that Plaintiff was "unable to perform/complete work-related tasks in a timely manner," and that her "COVID-19 causing fatigue" and related symptoms "contribute[] to worsening of her symptoms." *Id.* at 1352. Dr. Pocsine explained that long-haul COVID-19 triggers an autoimmune response in some patients causing "fatigue, increased sleep need, cognitive slowing and concentration difficulty, headaches, and difficulty stand/sit/walk without lightheadedness." *Id.* Dr. Pocsine advised that Plaintiff should reduce her hours to 20 per week (down from 30 hours), avoid working late or weekend hours, and continue working from home. *Id.* Counsel also provided a letter from Plaintiff reporting that, among other things, her annual billable hour requirement was 1900 hours, but in 2022 she billed just 789 hours. *Id.* at

1353. From January 18 through April 22, 2022, Plaintiff reportedly billed 268 hours
(averaging 20 hours per week). *Id.* at 1354. She concluded her letter by stating that her
COVID-19 illness has "severely affected all aspects of [her] life, and while . . . [she]
continue[s] to be optimistic that [her] condition will resolve with adequate rest and
potential future treatments and that [she] will be able to return to work full time, [] it is clear
in the meantime that [her] body is unable to support the full-time demands of [her] job."
*Id.*

Lynn McGuiness, Defendant's lead appeals specialist, handled the appeal. Ms.
McGuiness had Plaintiff's medical records reviewed by an outside internist Steven
Winkel, D.O., who was retained through Dane Street (like Dr. Chilungu). ECF No. 29 at
13. Dr. Winkel reviewed the medical evidence and completed an extensive report, but he
did not perform a physical exam. *Id.* at 1609–17. Dr. Winkel concluded that "the totality of
evidence documented in the available medical records did not support Plaintiff's
complaints of headache, tachycardia, hypotension, fatigue, GI issues, to rise to a level to
preclude the insured from performing the sedentary occupational demands . . . ." *Id.* at
1614. He provided the following rationale:

- "Despite having these symptoms, the insured was able to work from
  home part-time and go to the gym and do weightlifting." *Id.*

- "Serial physical examinations have noted the insured to be awake,
  alert, and oriented with normal mood, affect, behavior and speech
  and no cognitive deficits noted." *Id.*

- "The available medical records do not document emergency room
  evaluations or hospitalizations for headaches, dyspnea, tachycardia,
  chest pain, cognitive deficits, or GI issues." *Id.* at 1615.

- "While the insured complained of dyspnea and fatigue, the medical record did not document a pulmonary function test, 6-minute walk test, Lexiscan perfusion test, or cardiac MRI to evaluate for myocarditis." *Id.*

- "While the insured complained of cognitive impairment, the serial physical examinations do not document cognitive deficits. The insured has been noted to be awake, alert, and oriented with normal mood, and affect. The medical records do not document a MoCA test, Mini-Mental Status Examination." *Id.*

- Plaintiff's "self-reported activities exceed those of sedentary occupational demands." *Id.* at 1616.

On May 1, 2023, Defendant provided Dr. Winkel's report to Plaintiff's counsel with the opportunity to review and respond. *Id.* at 1647–48. Plaintiff's counsel responded two weeks later, providing another letter from Dr. Pocsine discussing medical literature regarding "long-haul COVID-19," explaining that it "is a condition where individuals continue to experience symptoms long after their acute illness has resolved . . . most commonly fatigue and cognitive slowing, which can significantly impact an individual's ability to work full-time," and outlining the concept of "gradual return to work" protocol. *Id.* at 1659–62. She reiterated that the "dominating feature" of Plaintiff's syndrome "is chronic fatigue and brain fog that made significant impact on her ability to fulfill . . . her duties at work as a lawyer." *Id.* Dr. Pocsine concluded that Plaintiff's "illness and her line of work as a lawyer [] supports her absence from work from 4/22/2022 through 7/20/2022 followed by gradual return to work." *Id.* at 1662.

Ms. McGuiness, apparently without the oversight of a physician or medical professional, reviewed the letter and recommended that the benefits decision stand. *Id.* at 1669. She drafted a ten-page letter with her reasoning and then sent the letter to

14

Plaintiff on June 28, 2023, explaining that Plaintiff could "perform the duties of her regular occupation and her disability did not extend beyond the required elimination period." *Id.* at 1671–80. Plaintiff then filed suit in this Court on September 7, 2023. ECF No. 1.

## III.  LEGAL STANDARD

The Plan grants Defendant discretion to determine benefit eligibility. ECF No. 26 at 14. The parties thus agree that the Court reviews Defendant's benefit determination under the deferential "arbitrary and capricious" standard of review. *Id.* (Plaintiff acknowledging that, "[w]here, as here, the insurer has discretion to determine the employee's eligibility the more deferential arbitrary and capricious standard applies."). "In the ERISA context, we treat the abuse of discretion and the arbitrary and capricious standards of review as interchangeable." *Loughray v. Hartford Grp. Life Ins. Co.*, 366 F. App'x 913, 923 (10th Cir. 2010). Under this standard of review, "the Plan's decision need not be the only logical decision nor even the best decision. Rather, the decision need only be sufficiently supported by facts known to the Plan to counter a claim that the decision was arbitrary or capricious. The decision will be upheld unless it is not grounded on any reasonable basis." *McClenahan v. Metro. Life Ins. Co.*, 621 F. Supp. 2d 1135, 1144 (D. Colo. 2009), *aff'd*, 416 F. App'x 693 (10th Cir. 2011).

The Court's task is to determine whether the Plan administrator's decision was "predicated on a reasoned basis." *Ellis v. Liberty Life Assurance Co. of Bos.*, 958 F.3d 1271, 1290 (10th Cir. 2020) (quoting *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006)). To be reasonable, the benefit determination must be based on "substantial evidence." *See Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382

(10th Cir. 1992). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker. Substantial evidence requires more than a scintilla but less than a preponderance." *Id.* (internal citations, quotations, and alteration omitted).

## IV.  ANALYSIS

Plaintiff raises five arguments on appeal. ECF No. 26 at 1–2. First, she argues that Defendant's benefits decision was not supported by substantial evidence because Defendant rejected out-of-hand the opinions of her treating doctors. *Id.* Second, Plaintiff argues that Defendant relied on the flawed legal premise that the ability to do some work, despite an impairing medical condition, precludes a later finding of disability. *Id.* at 2. Third, Plaintiff contends that Defendant failed to reconcile its contradictory positions that she was disabled throughout the 90-day elimination period for STD but not LTD, suggesting improper decision-making. *Id.* Fourth, even if Defendant's benefits decision had evidentiary and legal support, she argues that Defendant did not comply with the Tenth Circuit's holding in *D.K. v. United Behavioral Health,* 67 F.4th 1224 (10th Cir. 2023). *Id.* And fifth, Plaintiff argues that the Plan created a conflict of interest, and Defendant's failure to conduct an in-person medical examination highlights this conflict. ECF No. 26 at 15–16. The Court addresses each argument in turn.

1.    **Substantial Evidence**

    a.    *Plaintiff Overlooks the Opinions of Dr. Belander, Dr. Chilungu, and R.N. Vansandt*

Plaintiff characterizes the dispute as a battle of experts, arguing that her two treating physicians opined that Plaintiff cannot work full-time, and Defendant had *one* physicians who disagreed. ECF No. 26 at 14 ("Clearly, Drs. Burnett and Pocsine agree Plaintiff cannot yet work full-time and has other restrictions, and Dr. Winkel disagrees."). Although there is no magic number for the amount of physicians who must perform a records review, Plaintiff blatantly ignores the opinions of Dr. Belander, Dr. Chilungu, and R.N. Vansandt. Indeed, she does not even mention these three medical professionals in her opening brief and instead focuses solely on Dr. Winkel's review, the independent physician who performed a review on appeal. The Court further observes that Plaintiff's characterization is incorrect. As Defendant points out, Dr. Burnett did not assert any restrictions and limitations after Defendant asked, deferring that determination to Plaintiff's neurologist, Dr. Pocsine. A.R. at 661. Thus, Dr. Burnett did not assert that "Plaintiff cannot yet work full-time."[2] ECF No. 26 at 14.

    b.    *Reasonableness of Defendant's Benefits Decision*

Turning to actual facts of Defendant's review, the record reflects a lengthy medical-review process. Defendant's final benefits decision came after six levels of review by four medical professionals, all of whom unanimously determined that Plaintiff's restrictions and

---

[2] Plaintiff does not address this misrepresentation in her reply brief.

limitations were not supported. As reflected in the background section, Defendant performed the following reviews:

*Nurse Practitioner Vansandt.* N.P. Vansandt performed two clinical analyses of Plaintiff's claim, one before Dr. Pocsine provided restrictions and limitations and one after. A.R. at 651–56 (September 22, 2022 analysis); A.R. at 748–55 (October 10, 2022 analysis). N.P. Vansandt concluded in both analyses that Plaintiff's claim was unsupported, identifying a lack of "assessments or clinical findings" supporting "any cognitive limitations or impairment." *Id.* at 656; *id.* at 754 ("Information on file does not provide data (assessments or clinical findings) reflecting any cognitive limitations or impairments. [Plaintiff] has not been referred for any cognitive testing. [Plaintiff] presents to her appointments, able to recall information, assessments document alert and oriented, and has demonstrated ability to rtw on a part time basis. . . . Additional records from neurology do not reflect clinical findings consistent with [Plaintiff] lacking functional capacity to sustain working sedentary level [occupation]."

*Dr. Belanger.* Defendant also held two forum meetings with Dr. Belanger, again one before and one after Dr. Pocsine provided restrictions and limitations. Dr. Belanger wrote a doctoral review, concluding that Plaintiff's restrictions and limitations were not supported, noting that Plaintiff reported improvement of her symptoms, increase in physical activity, and lack of documentation supporting cognitive impairment. *Id.* at 768–69 (review dated October 27, 2022). Dr. Belanger expressly gave "significant weight to the attending physician" in reaching her conclusion, followed by a three-page analysis explaining her reasoning. *Id.* at 768 (e.g., explaining that "physical exam findings do not

support that the insured is precluded from performing the occupational demands," and that "no cognitive impairment is documented, and records indicate the insured has improved since the date of disability"). As one example, she noted that Dr. Pocsine's neurological exam documented noted 1 out of 10 headache pain. *Id.*

*Dr. Chilungu.* Defendant then referred Plaintiff's claim to Dr. Chilungu, an independent physician, to review Plaintiff's file and write a medical report. Like the other two medical professionals, he concluded that Plaintiff's restrictions and limitations were not supported. *Id.* at 774–77 (report not dated but completed after Dr. Pocsine's October 10, 2022 evaluation and report). He concluded that, although Plaintiff has "undergone autonomic testing suggesting a measure of autonomic dysfunction, *physical examinations inevitably reveal an individual who exhibits normal cognitive capabilities . . . ." Id.* at 776 (emphasis added). Thus, he agreed with Dr. Belanger that Plaintiff is not precluded from working full time in her role as an attorney. *Id.*

*Dr. Winkel.* Finally, Dr. Winkel, also an independent physician, reviewed Plaintiff's medical records and concluded that "*the totality of evidence documented in the available medical records* did not support Plaintiff's complaints of headache, tachycardia, hypotension, fatigue, GI issues, to rise to a level to preclude the insured from performing the sedentary occupational demands . . . ." *Id.* at 1614 (emphasis added). He made this determination after examining Plaintiff's various physical examinations and other notes in her medical records. *Id.* at 1614–16.

The medical records review performed by these four medical professionals were detailed and appear to be based on substantial evidence. In her reply, Plaintiff argues

that Defendant "vastly overstates the quality of those reviews" and argues that the reviews were "not founded on reliable evidence," ECF No. 32 at 2, but she is light on specifics. Under the arbitrary and capricious standard, this Court must "uphold the decision of the plan administrator 'so long as it is predicated on a reasoned basis,' and 'there is no requirement that the basis relied upon be the only logical one or even the superlative one.'" *Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey*, 663 F.3d 1124, 1134 (10th Cir. 2011) (quoting *Adamson v. UNUM Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006)). The Tenth Circuit has cautioned that this "standard is a difficult one for a claimant to overcome." *Nance v. Sun Life Assur. Co. of Canada*, 294 F.3d 1263, 1269 (10th Cir. 2002). Even Plaintiff acknowledges that Defendant's "decision does not [] need to reflect the best possible option," and that the Court "must" uphold Defendant's decisions if there is "substantial evidence" to support it. ECF No. 26 at 14.

The Court finds that substantial evidence supports Defendant's benefits determination.

### c. Defendant's Consideration of Dr. Pocsine's Opinion

Plaintiff implies that Defendant should have deferred to Dr. Pocsine's opinion, or at least given her opinion more weight. *See, e.g.*, ECF No. 26 at 1–2 (arguing that Defendant "reject[ed] out-of-hand the opinions of the treating doctors"). But in her reply, Plaintiff acknowledges that Dr. Pocsine's opinion is not afforded any special deference. ECF No. 32 at 13; *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) ("We hold that plan administrators are not obliged to accord special deference to the opinions of treating physicians.").

20

Although Defendant disagreed with Dr. Pocsine's restrictions and limitations, the record does not show that Defendant rejected Dr. Pocsine's opinion out of hand. Dr. Pocsine first wrote a letter on Plaintiff's behalf on October 10, 2022. A.R. at 712. In this brief letter, Dr. Pocsine explained that she was treating Plaintiff for "pandysautonomia caused by probable COVID 19 infection," that Plaintiff had "new onset headaches," and that her "symptoms include fatigue, cognitive slowing, intolerance to sit and stand with palpitations and near syncope, and exercise intolerance." A.R. at 712. This letter included restrictions and limitations for the first time. *Id.* (advising that Plaintiff could increase her workload to 30 hours a week but restricting her to working from home). Plaintiff does not argue that Defendant failed to consider this opinion, likely because she does not dispute that Dr. Belanger spoke with Dr. Pocsine on October 27, 2022. *See* A.R. at 764. Dr. Belanger then wrote a lengthy doctoral review concluding that "the evidence does not support restrictions and limitations" prescribed by Dr. Pocsine. *Id.* at 764–71.

Dr. Pocsine drafted another half-page letter on Plaintiff's behalf dated January 30, 2023. *Id.* at 1352. In that letter, Dr. Pocsine concluding that Plaintiff was "unable to perform/complete work-related tasks in a timely manner and contributes to worsening of her symptoms." *Id.* This letter, addressed "to whom it may concern" like the October 10, 2022 letter, asked that the recipient provide Plaintiff with the opportunity to "reduce weekly hours to 20" hours per week. *Id.* This letter was included in the appeals packet referred to outside internist Dr. Winkel, who considered the letter and all other medical records to conclude that the "totality of evidence documented in the available medical records did not support Plaintiff's complaints of headache, tachycardia, hypotension, fatigue, GI

21

issues, to rise to a level to preclude the insured from performing the sedentary occupational demands . . . ." *Id.* at 1614.

After providing Dr. Winkel's report to Plaintiff, Dr. Pocsine then responded to the denial letter with a third letter dated May 14, 2023. *Id.* at 1659–62. This letter was much more detailed and responded to Dr. Winkel's report. Unlike the previous two letters, Defendant did not ask a physician to review the letter and instead asked Ms. McGuiness, Defendant's lead appeals specialist, to review Dr. Pocsine's third letter. As noted, Ms. McGuiness, in a ten-page letter dated June 28, 2023, notified Plaintiff that Defendant was upholding its benefits decision. *Id.* at 1671–80.

Plaintiff's primary argument focuses on Defendant's handling of this third letter. Plaintiff argues that Defendant failed to engage in a "meaningful dialogue" between "the medical reviewer and the treating doctor's opinions." ECF No. 32 at 13.

Indeed, it would have been advisable for Defendant to provide additional documentation, including a physician review, in response to Dr. Pocsine's third letter. But, Plaintiff has failed to provide any authority that Defendant must respond to her treating physician's third letter (after responding to the first two letters) with another letter from a physician. Under the facts of this case, the Court cannot conclude that Defendant did not address Dr. Pocsine's medical opinion. The Court has already explained that Defendant's "reviewers were not required to defer to the treating physician opinions provided." *D. K.*, 67 F.4th at 1241. Rather, the Tenth Circuit has found that Defendant's "duties under ERISA require [it] to address medical opinions, particularly those which may contradict [its] findings." *Id.* Because two physicians (Drs. Belanger and Winkle) previously

22

responded to Dr. Pocsine's restrictions and limitations in lengthy medical reviews, and Dr. Belanger spoke with Dr. Pocsine about her medical opinion, the Court finds that Defendant engaged in a "meaningful dialogue" with Plaintiff and her treating physician. *See D. K.*, 67 F.4th at 1240.

* * *

In sum, the Court finds Defendant's benefits decision was supported by substantial evidence.[3]

### 2.    Plaintiff's Ability to Continue Working

Plaintiff next argues that Defendant "relie[d] on the flawed legal premise that the ability to do some work, despite an impairing medical condition, precludes a later finding of disability." ECF No. 26 at 2. Plaintiff's entire argument is that

> Dr. Winkel and Unum were steadfast in their insistence that Ms. [J.J.H.]'s ability to continue working after the initial infection proved she could work full-time in June, 2022. This argument is improper as a matter of law. *Rochow, supra; Nieves, supra*. An employee may try to work through a disability for many reasons, and it is not proof she was not disabled at the time. *Id.*

*Id.* at 18.

Although Defendant's medical reviewers considered Plaintiff's work history after she contacted COVID-19 in their determinations, it is plain that this work history was merely one factor they considered. Plaintiff has not cited any authority that merely

---

[3] In so holding, the Court is not necessarily agreeing that Defendant made the best decision, nor is it minimizing Plaintiff's health struggles, with which the Court sympathizes. The Court merely finds that Defendant satisfied the existing legal standards in reaching its benefits determination. *See Peterson v. Principal Fin. Grp.*, No. CIVA07CV01741LTBCBS, 2008 WL 4630576, at *8 (D. Colo. Oct. 17, 2008) ("The administrator's decision need not be the only logical one, nor even the best one; it need only fall somewhere along the continuum of reasonableness—even if on the low end.").

considering this fact renders the entire process and decision arbitrary and capricious. *See Rochow v. Life Ins. Co. of N. Am.*, 482 F.3d 860, 865 (6th Cir. 2007) ("The fact that Rochow remained on the payroll until January 2, 2002 is not determinative as to whether or not he was disabled during that time; there is no 'logical incompatibility between working full time and being disabled from working full time.'" (quoting *Hawkins v. First Union Corp. Long–Term Disability Plan,* 326 F.3d 914, 918 (7th Cir. 2003)); *Nieves v. Prudential Ins. Co. of Am.*, 233 F. Supp. 3d 755, 761 (D. Ariz. 2017) ("Prudential's primary argument appears to be that Plaintiff could not have been disabled before March 11, 2015, and therefore could not have had a disability claim before that date, because he was working full time for Comtech. Although this argument has superficial appeal, many cases have recognized that disability is not disproved by the mere fact that the claimant found a way to continue working.").

Although it would be improper to "penalized [Plaintiff] because [s]he had the courage and determination to continue working despite [her] disabling condition," *Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir. 1990), Plaintiff can point to no medical opinion that gave her work history "considerable weight.," as she contends. ECF No. 32 at 14. Instead, each medical reviewer looked at the "totality of [the] evidence" in making their findings, *see, e.g.*, A.R. at 1639, an approach the Tenth Circuit has approved. *Weiss v. Banner Health*, 846 F. App'x 636, 640 (10th Cir. 2021) ("We have interpreted [*Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)] to embrace a combination-of-factors method of review, in which case-specific factors are weighed together in evaluating whether the

24

benefits decision amounts to an abuse of discretion." (internal citation and quotations omitted)).

Defendant's consideration of Plaintiff's ability to continue working after contacting COVID-10 as a factor in its determination does not render the entire benefits decision arbitrary and capricious.[4]

### 3.    Defendant's Approval of Short-Term Disability

Plaintiff's third argument is that Defendant failed to reconcile its contradictory positions that she was disabled throughout the 90-day elimination period for STD but not disabled for LTD purposes. The record, however, does not support Plaintiff's argument.

In rejecting her LTD application, Defendant explained that the LTD claim process provides "a more in-depth review of the medical issues and other facts" than the STD claim process and "utilize[s] physicians to review the medical documentation." A.R. at 1678. Moreover, courts have suggested that the payment of previous benefits is merely a data point for a court to consider in its analysis. *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 767 (7th Cir. 2010) (finding that "the previous payment of benefits is just one 'circumstance,' i.e., factor, to be considered in the court's review process; it does not create a presumptive burden for the plan to overcome." (quoting *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832 (7th Cir. 2009)); *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002) ("We are not suggesting that

---

[4] This finding applies with equal force to Plaintiff's argument that Defendant erred in referencing Plaintiff's participation in physical therapy. *See* ECF No. 26 at 18. There is no indication, and Plaintiff does not point to any, that this fact was determinative of Defendant's benefits decision.

paying benefits operates forever as an estoppel so that an insurer can never change its mind.").

The Court finds that Defendant's decision to engage in a more detailed review at the LTD stage was reasonable, especially given that Plaintiff's STD benefits were self-funded by Plaintiff's law firm, and it is not unreasonable for an insurer to engage in a more-detailed review at the LTD stage.

### 4. Defendant's Dialogue with Plaintiff

Plaintiff's fourth argument is that Defendant "did not comply with the Tenth Circuit's holding in *D.K. v. United Behavioral Health,* 67 F.4th 1224 (10th Cir. 2023)." ECF No. 26 at 2. The Court assumes that Plaintiff refers to *D.K.*'s holding that ERISA requires plan administrators to engage in a meaningful dialogue with the beneficiary.

The Court is not persuaded by Plaintiff's argument. The record shows that Defendant provided its "reason for the denial . . . in reasonably clear language." *D. K.*, 67 F.4th at 1240 (quoting *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997)). Defendant provided its reasons in at least four letters to Plaintiff. A.R. at 681–87 (September 30, 2022 denial letter); *id.* at 790–98 (November 2, 2022 denial letter); *id.* at 1647–48 (May 1, 2023 letter attaching Dr. Winkel's report); *id.* at 1671–80 (June 28, 2023 letter notifying Plaintiff of Defendant's final benefits decision and its reasoning). Given the record before it, the Court cannot conclude that Defendant failed to engage in a meaningful dialogue with Plaintiff.

5.    **Conflict of Interest**

Finally, Plaintiff argues that there is an inherent conflict of interest because Defendant "both insures the plan and decides eligibility." ECF No. 26 at 15. The parties agree that the Court should take this apparent conflict into account, but as Defendant points out, it does not alter the level of review. *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 260 (6th Cir. 2006) ("[T]he standard of review is not altered to a less deferential standard when the benefits administrator is operating under a conflict of interest. Instead, as noted, the standard remains unchanged and the conflict of interest is to be considered in *applying* that standard." (internal quotation and citations omitted)). Moreover, Defendant correctly notes that a conflict of interest may be mitigated when the plan administrator retains independent physicians to evaluate the claim, as Defendant did here when it used Dane Street to retain outside physicians (Drs. Chilungu and Winkel) to perform a medical records review.[5] *See Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1193 (10th Cir. 2009) ("A conflict . . . 'should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . .'" (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008))).

Plaintiff, relying on out-of-Circuit authority,[6] also argues that Defendant erred in not conducting an in-person examination. ECF No. 26 at 16. Plaintiff's cited authority,

---

[5] Plaintiff does not address this fact in her reply brief.
[6] Plaintiff purports to cite a Tenth Circuit decision— "*Adams v. Metropolitan Life Ins. Co.,* 549 F. Supp. 2d 775, 790 (10th Cir. 2007)"—ECF No. 26 at 16, but that is not a Tenth Circuit decision. *Adams* is a Middle District of Louisiana decision where in the court agreed with the defendant that "a plan administrator's decision to have an independent physician to conduct a file review rather than a physical examination is not *per se* arbitrary." *Adams v. Metro. Life Ins. Co.*, 549 F. Supp. 2d 775, 790 (M.D. La. 2007). But, Plaintiff is correct that *Adams* determined that, because "headaches are subjective complaints, . . . the fact that only

27

however, explains that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005). Rather, the *Calvert* court explained that,

> as with the other factors upon which Calvert relies to attack Liberty's decision-making process, we regard Liberty's decision to conduct a file review rather than a physical exam as *just one more factor to consider in our overall assessment of whether Liberty acted in an arbitrary and capricious fashion*. Thus, while we find that Liberty's reliance on a file review does not, standing alone, require the conclusion that Liberty acted improperly, we find that the failure to conduct a physical examination—*especially where the right to do so is specifically reserved in the plan*—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.

*Id.* (emphasis added).

Even if the Court takes into account Defendant's decision to make a benefits decision based on a records review, the Court still cannot conclude that Defendant's decision was arbitrary and capricious. First, Plaintiff does not argue that the Plan reserved the right to an in-person exam like in *Calvert*. Second, Plaintiff does not identify what information a physical examination might have uncovered that was not adequately shown by her medical records, which included numerous physician examinations. Third, Dr. Belanger, who is board-certified in internal medicine and infectious diseases, spoke with both Drs. Pocsine and Burnett, which went beyond a mere records review. And fourth, even Plaintiff acknowledges that certain "conditions like pain or fatigue cannot not be

---

a file review was conducted is relevant. Therefore, this Court will take into consideration that the plaintiff was never examined by the independent physician consultant." *Id.*

objectively confirmed or tested for." ECF No. 26 at 17.[7] Thus, it is unclear what a physical examination would have shown. *See, e.g.*, ECF No. 32 at 2 (Plaintiff arguing that "no such evidence can exist" for "issues like pain and fatigue").

For these reasons, the Court is not persuaded that Defendant's structural conflict warrants a finding that the benefits decision was arbitrary and capricious.

## V. CONCLUSION

Consistent with the above analysis, the Court GRANTS the parties' Joint Motion for Determination, ECF No. 33, and AFFIRMS Defendant's benefit determination. The Clerk of Court is directed to close this case.

DATED this 9th day of July 2025.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge

---

[7] Plaintiff argues that Defendant insisted on "objective evidence," citing A.R. 1678–79, but the Court cannot find a single instance in the record where Defendant used that term or expressly insisted that she provide objective evidence.